1
2
3
4
5
6
7          UNITED STATES DISTRICT COURT

8          SOUTHERN DISTRICT OF CALIFORNIA

9

10   PETER T. ZISKIN,                    )   Case No. 14-CV-1080-W (JMA)
                                         )
11                      Petitioner,      )   **REPORT AND**
                                         )   **RECOMMENDATION RE**
12   v.                                  )   **MOTION TO DISMISS PETITION**
                                         )   **FOR WRIT OF HABEAS**
13   MARION SPEARMAN, Warden, et         )   **CORPUS**
     al.,                                )
14                                       )   **[ECF No. 8]**
                        Respondents.     )
15                                       )
     ─────────────────────────────      )
16

17         In 2006, a jury convicted Petitioner Peter T. Ziskin ("Petitioner") of

18   seventeen (17) felony counts of committing a lewd act upon a child.

19   Petitioner has filed a Petition for Writ of Habeas Corpus ("Petition").  (ECF

20   No. 1.)  Respondent Marion Spearman, Warden ("Respondent"), has filed a

21   motion to dismiss the petition on the ground that it was untimely filed.

22   (ECF No. 8.)  Petitioner opposes the motion, arguing, among other things,

23   that he is entitled to an exception to the statute of limitations because he is

24   actually innocent.  For the reasons set forth below, the Court recommends

25   that the motion to dismiss be **GRANTED** and that the Petition be

26   **DISMISSED** as untimely.

27   //

28   //

# I.    Procedural Background

Petitioner, while a teacher at Rincon Middle School ("Rincon") in Escondido, California, was accused by Information with twenty-six (26) counts of lewd act upon a child in violation of Cal. Penal Code section 288(a).  (Lodgment No. 2, Clerk's Transcript ("CT") vol. 1, 12-22.)  The jury trial commenced on April 24, 2006.  (Lodgment No. 1, Reporter's Transcript ("RT") vol. 2.)  On May 31, 2006, the jury found Petitioner guilty of seventeen (17) of the lewd act on a child counts, with true findings the violations were committed against more than one victim in violation of Penal Code sections 667.61(b), (c)(8), and (e)(5).  (Lodgment No. 1, RT vol. 13; Lodgment No. 2, CT vol. 5, 952-77.)  Petitioner was acquitted on six (6) counts of lewd act on a child, and the jury was unable to reach a verdict on the remaining three (3) of those counts as well as on a substantial sexual conduct charge.  (Id.)  On July 18, 2006, the trial court sentenced Petitioner to fifteen (15) years to life on each of the guilty counts, to run concurrently.  (Lodgment No. 1, RT vol. 14; Lodgment No. 2, CT vol. 5, 1055-57.)

Petitioner appealed to the California Court of Appeal, Fourth District.  (Lodgment Nos. 3-5.)  On April 23, 2008, the appellate court affirmed the convictions and sentence.  (Lodgment No. 6.)  Petitioner filed a petition for rehearing; the appellate court issued an order modifying its opinion and denying the petition for rehearing on May 8, 2008.  (Lodgment Nos. 7-8.)  Petitioner filed a petition for review with the California Supreme Court, which was denied without comment on July 23, 2008.  (Lodgment Nos. 9-10.)

On October 22, 2009, Petitioner filed a petition for writ of habeas

14cv1080

1  corpus with the San Diego Superior Court. (Lodgment No. 12.)[1] An order

2  for hearing was issued on September 26, 2011, and an evidentiary hearing

3  was conducted over several days in early 2012. (Lodgment Nos. 13-14.)

4  On April 27, 2012, the habeas petition was denied. (Lodgment No. 15.)

5  The five claims addressed by the state habeas court included: (1) whether

6  Petitioner was preventing from testifying at trial by his attorneys;

7  (2) whether Petitioner's trial counsel were incompetent for failing to call a

8  Stoll[2] expert; (3) whether new testimony provided by victim Juan M. and his

9  mother required a granting of the writ; (4) whether there was a conspiracy

10  between some of the boys to get Petitioner convicted; and (5) whether

11  there had been a Brady[3] violation. (Id.) On August 14, 2012, Petitioner

12  filed a habeas petition with the California Court of Appeal. (Lodgment Nos.

13  16-17.)[4] On October 3, 2012, the petition was denied. (Lodgment No. 18.)

14  Petitioner then filed a petition for review in the California Supreme Court,

15  which was denied without comment on December 12, 2012. (Lodgment

16  Nos. 19-21.)

17       On April 29, 2014, Petitioner filed a Petition for Writ of Habeas

18

---

19  [1]Petitioner's initial state habeas petition bears a file date of January 12,
20  2010. (See Lodgment No. 12.) It appears that Petitioner initially filed the habeas
   petition in the Civil Business Office of San Diego Superior Court on October 22,
21  2009. On January 12, 2010, the petition was filed in the Criminal Business Office
   of the court. (See Lodgment No. 11 at 2; Resp.'s Mem., ECF No. 8-1 at 16-17.)

22  [2]People v. Stoll, 49 Cal. 3d 1136 (1989), which provides that under
   California's rules of evidence, an accused may present expert opinion testimony
23  to show his nondisposition to commit a charged sex offense.

24  [3]Brady v. Maryland, 373 U.S. 83, 87 (1963), which holds that the
   suppression by the prosecution of evidence favorable to an accused (exculpatory
25  information) violates due process where the evidence is material either to guilt or
   punishment, irrespective of the good faith of the prosecutor.
26

27  [4]Petitioner initially filed his habeas petition with the California Court of
   Appeal on July 17, 2012, but the appellate court denied Petitioner's request for
28  leave to file an oversized brief and denied the petition without prejudice. (See
   Lodgment No. 16 at 3.) Petitioner filed an edited and reduced petition on August
   14, 2012. (Id.)

Corpus pursuant to 28 U.S.C. § 2254 in this Court, setting forth four claims: (1) Petitioner was denied his right to testify due to trial counsel's and the trial court's failures to advise him of that right; (2) newly discovered evidence demonstrates his actual innocence; (3) the prosecutor committed misconduct by failing to disclose exculpatory evidence; and (4) the trial court erred by allowing the prosecutor to shift the burden of proof.  (Pet. & Mem. in Supp., ECF No. 1 at 9-12 & 18-38.)  Respondent filed a motion to dismiss the petition as untimely on June 3, 2014.  (ECF No. 8.)  Petitioner filed an opposition on August 12, 2014.  (ECF No. 12.)

## II.    Statute of Limitations Under the AEDPA

The statute of limitations under the Antiterrorism and Effective Death Penalty Act ("AEDPA") applies to Petitioner's presentation of claims in this Court.  Calderon v. U.S. District Court (Beeler), 128 F.3d 1283, 1286-87 (9th Cir. 1997), as amended on denial of rhg. and rhg. en banc, cert. denied, 522 U.S. 1099 (1998), overruled on other grounds in Calderon v. U.S. District Court, 163 F.3d 530 (9th Cir. 1998), cert. denied, 523 U.S. 1063 (1999).  Pursuant to 28 U.S.C. § 2244(d)(1):

> A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of --
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

1

2

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

3   28 U.S.C. § 2244(d)(1)(A)-(D).  The conclusion of direct review of

4   Petitioner's conviction occurred on July 23, 2008, when the California

5   Supreme Court denied the petition for review.  28 U.S.C. § 2244(d)(1)(A);

6   see also Clay v. U.S., 537 U.S. 522, 527 (2003).  Adding the ninety days

7   within which a petition for a writ of certiorari may be filed, Wixom v.

8   Washington, 264 F.3d 894, 897 (9th Cir. 2001), the date on which

9   Petitioner's conviction became final was October 21, 2008.  Petitioner had

10  until one year later, October 21, 2009, to file his federal habeas petition.  28

11  U.S.C. § 2244(d)(1); Patterson v. Stewart, 251 F.3d 1243, 1246 (9th Cir.

12  2001).  Petitioner, however, did not file his federal habeas petition until

13  April 29, 2014, over four (4) years after the limitations period expired.

14  Absent grounds for statutory or equitable tolling, delayed accrual, or some

15  other exception to the statute of limitations, the Petition is time-barred.

16      **A.    Statutory Tolling**

17      The AEDPA tolls its one-year limitations period for the "time during

18  which a properly filed application for State post-conviction or other

19  collateral review . . . is pending."  28 U.S.C. § 2244(d)(2).  "An application

20  for post-conviction review is pending while a California petitioner completes

21  a full round of state collateral review, including during the period between

22  (1) a lower court's adverse determination, and (2) the prisoner's filing of a

23  notice of appeal, provided that the filing of the notice of appeal is timely

24  under state law."  Waldrip v. Hall, 548 F.3d 729, 724 (9th Cir. 2008)

25  (citations and internal quotations omitted, emphasis omitted).  In California,

26  "[a]s long as the prisoner filed a petition for appellate review within a

27  'reasonable time,' he could count as 'pending' (and add to the 1-year time

28  limit) the days between (1) the time the lower state court reached an

adverse decision, and (2) the day he filed a petition in the higher state court." Evans v. Chavis, 546 U.S. 189, 193 (2006) (citing Carey v. Saffold, 536 U.S. 214, 222-23 (2002)).

Here, Petitioner filed his first state habeas petition on, at the earliest, October 22, 2009, one day after the AEDPA statute of limitations ended. (See Section I. & n.1, *supra*.)  Thus, the pendency of that petition, or any other habeas petition filed subsequently by Petitioner, could not toll the already-expired limitations period pursuant to 28 U.S.C. § 2244(d)(2).  See Jiminez v. Rice, 276 F.3d 478, 482 (9th Cir. 2001) (finding that statutory tolling is not available when first state habeas petition is filed after the AEDPA limitations period has expired).  Statutory tolling cannot revive a limitations period that has already ended; it can only serve to pause a clock that has not already run.  Ferguson v. Palmateer, 321 F.3d 820, 823 (9th Cir. 2003); Patterson, 251 F.3d at 1247.  Once the federal limitations period has ended, the filing of a state habeas petition cannot revive it.  Ferguson, 321 F.3d at 823; Jiminez, 276 F.3d at 482.

Moreover, as Respondent contends, there is a second period of time which is also sufficient to find the Petition untimely.  Even assuming Petitioner's first state habeas petition was timely filed, and tolling was in effect until the California Supreme Court's denial of the petition for review on December 12, 2012, more than one year elapsed between December 12, 2012 and April 29, 2014, when Petitioner filed his federal habeas petition.

Therefore, unless Petitioner is entitled to equitable tolling or delayed accrual under 28 U.S.C. § 2244(d)(1)(D), the limitation period expired on October 21, 2009.[5]

---

[5]The Court notes that Petitioner expressly states he does not rely on the applicability of statutory tolling.  (Opp'n, ECF No. 12 at 4.)

**B.   Equitable Tolling**

Equitable tolling requires Petitioner to establish two elements: "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way."  Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005).  Equitable tolling is available only if some "external force" beyond the Petitioner's direct control caused the untimeliness.  Velasquez v. Kirkland, 639 F.3d 964, 969 (9th Cir. 2011).  Equitable tolling is unavailable in most cases, and "the threshold necessary to trigger equitable tolling . . . is very high, lest the exceptions swallow the rule."  Miranda v. Castro, 292 F.3d 1063, 1066 (9th Cir. 2002).

Although Petitioner does not concede that equitable tolling does not apply, he states, "[T]he Petition is not premised on the theory that the statutory time was tolled.  Rather, the Petition was prompted by newly discovered evidence which demonstrates Petitioner's factual innocence and premised on the exception discussed in [McQuiggin v. Perkins, --- U.S. ----, 133 S.Ct. 1924 (2013) ]."  (Opp'n, ECF No. 12 at 4 n.2.)  Further, he states, "Whether equitable tolling . . . might apply . . . is *not* the issue presented here[,]" as well as "That Petitioner has not relied on . . . equitable tolling is made clear in the Petition and the Declaration attached to it."  (Id. at 4 (emphasis in original).)

As Petitioner has not met his burden of demonstrating either diligence or extraordinariness, the AEDPA's statute of limitations should not be equitably tolled in his case.

**C.   Delayed Accrual**

Although neither party has briefed "delayed accrual" under 28 U.S.C. § 2244(d)(1)(D), that is, that the belated discovery of exculpatory evidence may have delayed the commencement of the limitations period until the date on which Petitioner knew or should have known the factual basis for

his claims, the Court will briefly address it here.  Petitioner contends that, "The new evidence at issue in this petition was discovered long after trial and after Petitioner was sentenced to state prison."  (Dunn Decl. in Supp. of Pet., ECF No. 1 at 16.)  Specifically, he states the new evidence was not discovered until the state court held a hearing on Petitioner's state habeas petition in 2012.  (Mem. in Supp. of Pet., ECF No. 1 at 24; Lodgment No. 14.)   Even if delayed accrual under subsection (D) of section 2244(d)(1) were appropriate, and the commencement of the limitations period did not begin until 2012, because the federal habeas petition was not filed until 2014, more than one year later, the limitation period under AEDPA was expired.

In sum, after considering statutory tolling, equitable tolling, and delayed accrual, the Court concludes the Petition was not filed within AEDPA's one-year limitations period and, absent a showing of actual innocence, is time-barred.

### D.   Actual Innocence Exception

Petitioner contends that the statute of limitations does not bar consideration of the Petition because he is actually innocent.  (Dunn Decl. in Supp. of Pet. & Mem. in Supp. of Pet., ECF No. 1 at 16 & 32-33; Opp'n, ECF No. 12 at 1-7.)

The Supreme Court recently held that the statute of limitations under AEDPA may be overcome by a showing of actual innocence.  See McQuiggin, 133 S.Ct at 1928.  This exception to the statute of limitations, however, applies only when the petitioner shows "that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence."  Id. at 1935 (quoting Schlup v. Delo, 513 U.S. 298, 327 (1995)).  "[A] credible claim of actual innocence constitutes an equitable exception to AEDPA's limitations period, and a petitioner who makes such

a showing may pass through the Schlup gateway and have his otherwise time-barred claims heard on the merits." Lee v. Lampert, 653 F.3d 929, 932 (9th Cir. 2011).  In order to pass through the Schlup gateway, a petitioner must produce such proof of his actual innocence as to bring him "within the narrow class of cases . . . implicating a fundamental miscarriage of justice." Id. at 937 (quotations and citation omitted).  In order to fit within the exception, a petitioner is required "to support his allegations of constitutional error with new reliable evidence–whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence–that was not presented at trial." Schlup, 513 U.S. at 324.  "The habeas court then 'consider[s] all the evidence, old and new, incriminating and exculpatory," admissible at trial or not." Lee, 653 F.3d at 938 (citing House v. Bell, 547 U.S. 518, 538 (2006) and Carriger v. Stewart, 132 F.3d 463, 477-78 (9th Cir. 1997)).  The emphasis on "actual innocence" allows the district court to consider all relevant evidence that was either excluded or unavailable at trial.  Schlup, 513 U.S. at 327-38.  "On this complete record, the court makes a 'probabilistic determination about what reasonable, properly instructed jurors would do.'" Lee, 653 F.3d at 938 (citing House, 547 U.S. at 538).

        "[T]enable actual-innocence gateway pleas are rare[.]" McQuiggin, 133 S.Ct. at 1928.  "[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." Schlup, 513 U.S. at 329.  In making this assessment, "the court may consider how the timing of the [petition] and the likely credibility of the affiants bear on the probable reliability of that evidence." Id. at 332.  A petitioner's diligence is considered not discretely, but rather "as part of the assessment whether actual innocence has been

convincingly shown." McQuiggin, 133 S.Ct. at 1936.  "In conducting a
Schlup gateway review, [the court's] 'function is not to make an
independent factual determination about what likely occurred, but rather to
assess the likely impact of the evidence on reasonable jurors.'" Stewart v.
Cate, 757 F.3d 929, 937 (9th Cir. 2014) (citing House, 547 U.S. at 538).
"[C]laims of actual innocence are rarely successful." Schlup, 513 U.S. at
324.  Only when the petitioner "presents evidence of innocence so strong
that a court cannot have confidence in the outcome of the trial unless the
court is also satisfied that the trial was free of nonharmless constitutional
error" may the petitioner pass through the Schlup gateway and have the
court consider his petition on the merits.  Stewart, 757 F.3d at 937 (quoting
Schlup, 513 U.S. at 316).

## 1. Evidence Presented at Trial

The following summary is taken from the California Court of Appeal's
opinion in People v. Peter Thomas Ziskin, No. D049152, slip op. (Cal. Ct.
App. Apr. 23, 2008).  (See Lodgment No. 6.)[6]

> Ziskin was convicted of committing numerous lewd acts with his
> male students from August 2004 through January 2005 while
> he was a sixth and seventh grade teacher at Rincon Middle
> School.  Ziskin's male students would frequently wrestle with
> him, initiating the activity by jumping on him and laughing.
> Ziskin would lift the boys up, flip them over his shoulder, and
> spin them around.  The lewd touching typically occurred during
> the course of this activity.
>
> On January 14, 2005, instructional aide Nancy Kramar was in
> Ziskin's classroom assisting students.  After the bell rang and
> only a few students were in the classroom, Kramar saw Ziskin
> pick up a boy and swing him around, with his hand touching
> "outside [the boy's] pants in the area of the crotch."  Kramar felt
> uncomfortable about her observation.  On January 18, 2005,

---

[6]After independent review of the record, the Court adopts the California
Court of Appeal's factual summary as a fair and accurate summary of the
evidence presented at trial.  The factual summary is entitled to a presumption of
correctness pursuant to 28 U.S.C. § 2254(e)(1).  See, e.g., Tilcock v. Budge, 538
F.3d 1138, 1141 (9th Cir. 2008).  Petitioner may rebut the presumption of
correctness, but only by clear and convincing evidence.  Id.; see also 28 U.S.C. §
2254(e)(1).

14cv1080

Kramar went to Ziskin's classroom during Ziskin's lunch period to leave him a message about a change in her assignment. When she walked into the classroom, Ziskin was holding a boy (David) on his shoulders and spinning the boy around. When Ziskin saw Kramar, he put the boy down. Kramar saw Ziskin's hand "struggle a couple of times as he tried to get his hand out of the boy's pants." Kramar observed Ziskin's hand was "pretty deep" inside the front of David's pants because he had to struggle to get it out. There were no other people in the room other than Ziskin and David. Kramar reported the incidents to the school administration.

During the ensuing investigation, numerous boys (including David) revealed that on some occasions while wrestling with Ziskin in the classroom, Ziskin put his hand in their pants and touched their penises. We summarize the boys' testimony.

*David*

While lifting David up during wrestling activity, Ziskin touched David's "private part" under his clothes with his hand. This happened in the classroom on more than two occasions. At first David thought the touching was accidental. Sometimes Ziskin's hand was still, and other times his hand rubbed David's "dick." David felt "weird" from the touching, and David stopped playing with Ziskin because he did not want to be touched in this manner.

*Brandon*

While they were wrestling, Ziskin lifted Brandon up and stuck his hand in his pants under his underwear and touched his penis. Sometimes Ziskin would just put his hand over Brandon's penis and sometimes he would rub Brandon's penis. The touching occurred in the classroom during passing periods, and happened on more than two occasions.

*Juan*

When Ziskin was wrestling with Juan and spinning him around, Ziskin put his hand inside Juan's pants and touched him on his "manhood" under his underwear. The touching occurred on about five occasions in the classroom, when there were about 15 or more students in the classroom. Juan initially thought the touching was accidental. Juan viewed the touching as a "[b]ad" touching. The touching made him feel uncomfortable and "weird" because "no one really touches [him] there."

*Charles*

When Ziskin was wrestling with Charles, Ziskin put his hand under Charles's pants, picked him up, and swung him in a circle. On several occasions during this activity, while Ziskin was picking Charles up off the floor, Ziskin's hand touched Charles's penis under his boxers. This touching occurred in the classroom after school on more than two occasions. On one

14cv1080

occasion it happened when they were alone in the classroom. Ziskin's hand was moving when it was touching Charles's penis. At first Charles thought the touching was innocent, until Ziskin kept touching his penis. One time, when Charles's penis was between Ziskin's ring and middle fingers, Charles said, "Ow." Ziskin responded as if the touching was a joke. The touching felt "wrong" and "uncomfortable."

*Gabriel*

On several occasions Ziskin picked Gabriel up off the ground and swung him around, and while doing so touched Gabriel's "dick" with his hand underneath Gabriel's boxers. Sometimes Ziskin would put Gabriel back down to "get a better grip" of Gabriel's pants and his "dick." The touching made Gabriel feel uncomfortable. He viewed it as a "bad kind" of touching, explaining that "usually if someone was going to pick [him] up, they wouldn't pick [him] up underneath the boxers." The touching occurred on more than two occasions, and happened mostly after school when Gabriel would stay for help with homework.

On one occasion when Gabriel was in the classroom with another victim (Luis) and Ziskin picked Gabriel up, Gabriel stated, "Stop. You're touching my balls." Ziskin responded, "Oh, sorry." Corroborating Gabriel's testimony, Luis testified that he saw Ziskin put his hand under Gabriel's boxers, and Gabriel told him to stop because he was touching his "balls." Three or four days after this incident, Ziskin again touched Gabriel's penis.

*Luis*

When they were wrestling, Ziskin picked Luis up and spun him around. One two occasions while doing so, Ziskin "cupped [Luis's] private," touching his "balls" with his hand over his clothes. This happened after school in the classroom. At first Luis thought the touching was accidental. Luis thought the touching was a "bad" touching. It made Luis feel "weird," and he stated to Ziskin, "What are you doing?"

*Nick G.*

On one occasion after school when Nick G. was in the classroom wrestling with Ziskin, Ziskin straddled Nick while Nick was laying on the floor. Ziskin "stuck his hand down [Nick's] pants" and touched his "private areas." The touching felt "[v]ery inappropriate" and Nick G. felt "violated." Nick G. told Ziskin to stop, and Ziskin responded that he thought they could just play around.

*Nick M.*

On one occasion when Ziskin and Nick M. were alone in the classroom, Ziskin made Nick M. uncomfortable by "putting [him] upside down and putting his hand down [his] pants." When

14cv1080

Ziskin put his hand down Nick M.'s pants, Ziskin touched his private part. Ziskin's hand was moving; Nick M.'s private part was hard; and the touching lasted for about one minute. After this touching, Ziskin told Nick M. that they were "buddies" and that if Nick M. told anyone Ziskin would get into trouble. After this incident, Nick M. did not engage in the flipping activity again. Ziskin asked him if he would like to be flipped again, and Nick M. told him no.

*Defense and Rebuttal*

In his defense, Ziskin presented numerous character witnesses who testified that they frequently observed Ziskin play with children and never observed any inappropriate touching. Further, two defense experts (Drs. Phillip Esplin and Thomas Streed) testified regarding factors that affect memory and create suggestibility.[2] During its rebuttal case, the prosecution presented four taped interviews of the victims that were made during the case investigation. In surrebuttal, Dr. Streed opined that one of the taped interviews was conducted in a suggestive manner.

*Jury Verdict*

The jury found Ziskin guilty of 17 counts of lewd act on a child under age 14 (§ 288, subd. (a)), with true findings that the violations were committed against more than one victim (§ 667.61, subds. (b), (c)(8), (e)(5)). The jury acquitted Ziskin of six alleged lewd act counts. The jury was unable to reach a verdict on three alleged lewd act counts and was unable to reach a verdict that Ziskin engaged in substantial sexual conduct with victim Nick M.[3] Ziskin was sentenced to 15 years to life.

[2] Suggestibility is "a term that relates to factors that can influence or impact the alteration or changing of memory."

[3] The jury's verdicts were as follows: (1) three guilty counts for David; (2) two guilty counts and one hung count for Brandon; (3) three guilty counts, two not guilty counts, and one hung count for Juan; (4) three guilty counts for Charles; (5) two guilty counts and one hung count for Gabriel; (6) two guilty counts for Luis; (7) one guilty count for Nick G.; and (8) one guilty count for Nick M. The jury was unable to reach a verdict on the sole allegation of substantial sexual conduct (masturbation), which was alleged for Nick M. Additionally, the jury found Ziskin not guilty of three counts involving Rincon Middle School student Erick R., and not guilty of one count involving a boy (Jesse) who was not a Rincon Middle School student and who described a touching of his upper leg at night while he was sleeping, which occurred when Ziskin was visiting the boy's residence.

(Lodgment No. 6 at 2-7.)

## 2.   **"New" Evidence**

In support of his claim that he falls within the actual innocence exception to the statute of limitations, Petitioner relies on the following evidence:  the testimony of Rosa Colima Mendez, the mother of victim Juan M., that she overheard some of the boys saying at the courthouse that they might make money if their testimony led to their teacher going to jail; the testimony of victim Juan M. that he and his friends believed they would receive money if they testified against Petitioner, and that he did not tell the truth when he testified at trial; the declaration of former Rincon student Marcus A. that he talked to other boys at school about making money by making accusations against Petitioner; the declaration of former Rincon student Eric Molho that he heard many of his classmates talking about accusing Petitioner of touching them so they could get money; the declaration of Kalara Wilk, a former Rincon student, that some of the victims had "smug" expressions on their faces at school; the declaration of Victoria Draper Stubblefield, a teacher at Rincon, that the situation with Petitioner was "a big joke to these kids"; the declaration of Mary Jo Blaze, a teacher at Rincon, that Petitioner's "horseplay" with the students "wasn't anything sexual"; the declaration of William Bradler, a former student at Rincon, that there was a "buzz" around the school about how kids would be getting money and everyone was "jumping on the bandwagon"; the declaration of Claire Molho, a school volunteer, that there was "scuttlebutt" around the school that the boys accusing Petitioner were getting money for testifying; the declaration of Shelby Atkins, a former student at Rincon, that some of the victims were standing around at school, laughing about telling the police that Petitioner had "grabbed their junk" so he would get fired; the declaration of Sheila Atkins, Shelby's mother, that her daughter was upset

14cv1080

1 about boys getting Petitioner into trouble by lying; the declaration of Susan
2 Scott, a teacher at Rincon, that the accusing students were allowed to talk
3 to each other in between giving their statements to school administrators
4 and/or the police; and the declaration of Donald Ziskin, Petitioner's cousin
5 and an attorney, that victim Nick G. filed a lawsuit against Petitioner and
6 the Escondido School District.  (Mem. in Supp. of Pet., ECF No. 1 at 24-
7 30.)[7]

8               a.    **Testimony of Rosa Colima Mendez**

9         On February 16, 2012, Rosa Colima Mendez testified at the
10 evidentiary hearing held by the San Diego Superior Court on Petitioner's
11 habeas petition.  (CT, Lodgment No. 14 at 4-5; Mendez Test., Lodgment
12 No. 17 vol. 3, Ex. 4.)[8]  Mendez, who speaks Spanish and testified with the
13 assistance of an interpreter, testified that she accompanied her son to court
14 for what is believed to have been the preliminary hearing.  At that time, she
15 was sitting in a cafeteria or TV room in the courthouse near three of the
16 boys, including her son, who were having a conversation in Spanish.
17 Mendez testified the boys "were saying that they were all in this case and
18 in case the teacher would be sent to jail, then they might get some money."
19 (Mendez Test. at 75-76.)  Mendez claims she informed the prosecutor,
20 Tracy Prior, about the conversation during one of Prior's visits to her
21 home.[9]

22

23 _____

      [7]The Court considers all of the documents and exhibits presented by
Petitioner without regard to their admissibility, as <u>Schlup</u> makes clear that the
24 Court "is not bound by the rules of admissibility that would govern at trial."
<u>Schlup</u>, 513 U.S. at 327.  Moreover, neither party has objected to the Court
25 considering any of the lodged documents or exhibits submitted by the other.

26      [8]Ms. Mendez also signed a declaration on September 26, 2010 and
provided a videotaped interview to an investigator working on behalf of Petitioner
27 on September 30, 2010.  (Lodgment No. 17 vol. 3, Ex. 3.)

28      [9]There is no indication in the record before the Court whether it was ever
established that Mendez indeed notified Prior about this conversation.

14cv1080

1    Before Mendez's son, Juan M., talked to the police about his

2  allegations, he told her that Petitioner had accidentally touched the area

3  covered by his pants, around the genital area.  Juan told her that he had

4  been playing with Petitioner, Petitioner tried to grab his pants, and the

5  pants broke.  Prior to her 2012 testimony at the habeas evidentiary

6  hearing, Mendez had not been aware that Petitioner had once pulled up

7  Juan's shirt and blown a "raspberry" on his stomach.  Mendez stated she

8  had seen her son cry on different occasions as he was "so regretful that he

9  had not done anything to help his teacher" and that "he had continued to

10  say the same thing because of what his classmates had been saying."  (Id.

11  at 90.)  She has always believed Petitioner was innocent, based on what

12  she overheard at the courthouse, as well as her own personal observation

13  of Petitioner as a teacher.

14              **b.    Testimony of Juan M.**

15      Juan M.[10] also testified on February 16, 2012 at the evidentiary

16  hearing held by the San Diego Superior Court on Petitioner's habeas

17  petition.  (CT, Lodgment No. 14 at 4-5; Morales Test., Lodgment No. 17

18  vol. 3, Ex. 6.)[11]  He recalls being brought into a room at the courthouse with

19  a TV with 10 to 13 of the other kids involved in the case and their parents.

20  The parents were speaking in Spanish, and the kids were speaking in

21  English.  He testified, "I personally was excited.  And I'm sure a few other

22  kids were also, because we were, we were under an assumption that we

23  were probably going to get some money if we kind of went through with this

24

25      [10]Juan's full name is Juan Carlos Morales.  Although he is now an adult, the
26  Court refers to him as "Juan" for consistency with the trial and appellate record in
    this case.  The Court will do the same with respect to all individuals who provided
27  trial testimony as a minor.

28      [11]Juan also signed a declaration on October 5, 2010 and provided a
    videotaped interview to an investigator working on behalf of Petitioner on
    September 30, 2010.  (Lodgment No. 17 vol. 3, Ex. 5.)

14cv1080

whole thing." (Morales Test. at 12.)  A classmate, Marcus A., led the

discussion of a group of at least five kids, which included Charles,

Brandon, and himself, about receiving money for their testimony.  Juan

assumed he would receive money based on what he had seen in the news

about the Michael Jackson and sexual harassment cases, and thought,

"Sweet, like this . . . this thing happened . . . maybe I'm going to get money

. . . ." (Id. at 18.)  Marcus first brought up the idea of receiving money after

all the boys had already given their accounts to the police detectives at

school.  The boys talked about this multiple times at school and once at

Brandon's house.  Juan elaborated, "We just went with what Marcus was

saying because as kids you don't want to be the outsider of your group and

you don't want to be the loser and the one that everyone picks on, . . . so I

went with what they were saying just so I could fit in with our group, my

friends." (Id. at 23.)   When asked exactly what this meant, he stated,

"Specifically that we were kind of going to exaggerate the truth a little bit,

us saying that, uhmm, we did feel molested, because now as an adult I

know the difference between a sexual touching and accidental touching

and a touching that's completely innocent, . . . ." (Id.)

> Juan further testified:
>
> As kids we thought it was funny, weird, we felt
> disturbed that a sort of touching happened on us
> but we didn't understand the real meaning of that
> touching . . . . [¶] My exaggeration of the truth is
> that really I didn't feel molested at all because he
> wasn't trying to like give me oral sex or saying come
> hang out with me, I'll take you to the movies, or it's
> raining, do you want a ride home, like let's hang out
> at your house, like none of that ever happened and
> I'm sure it wouldn't have happened anyways . . . .
>
> I think the thing that only really does disturb me a
> little bit was, uhmm . . . when he -- he blew on my
> stomach and that was really it.  Because I think the
> time that he did touch my penis it was a complete
> accident, I know it is, because . . . I roughhouse,
> too, I even wrestled, and sometimes I did happen to
> accidentally touch another boy, but I never said do

1
2
3
4

> you want to come back to my house and have sex
> now, like, no, because I know the difference of
> when you're actually playing and when you're not
> and when you mean something for sexual
> gratification and when it's just . . . not . . . when it's a
> complete accident.

5  (Id. at 24, 26, 27.)  Juan testified that he exaggerated at trial when he

6  stated that Petitioner had touched him more than six times, when in

7  actuality, Petitioner touched his "penis and balls" on only one occasion,

8  hand-to-skin, when his pants broke.  (Id. at 32, 67-68.)[12]  Most of the time

9  when he wrestled with Petitioner, Petitioner would grab him by the

10  waistband of his pants.

11      Juan testified the following about not being completely truthful:

12
13
14
15
16
17
18

> It even happened when I was talking to the detectives,
> uhmm . . . it was mainly about the way I felt about it,
> because . . . I didn't feel molested how I told you, I really
> didn't, and the number of occasions that this thing
> happened, I was . . . lying about the numbers.  [¶]  And I
> know I wasn't because he didn't do it, I know he didn't do
> it for sexual gratification because he never -- like that
> occasion that my pants ripped, he never said why don't
> you just take them off or why don't you get naked, he
> never said that.  And I know a pedophile would of, he
> would have taken advantage of that situation of having a
> student in his classroom with pants broken, he might as
> well said just take them off.

19  (Id. at 41.)  Juan adored Petitioner as a student, and still does.  He did not

20  understand, as a kid, the severity of what he was doing when he testified

21  against Petitioner, and now feels horrible as he feels he wrongfully accused

22  him.  He feels ashamed and guilty that he lied and that Petitioner is in

23  prison.  He has been wrestling with this for a long time and it is emotional

24  for him.  Juan's mother has always told him that she thought Petitioner was

25  innocent, because she felt he had lied, and his entire family criticized him

26  for testifying against Petitioner.

27

28      [12]Juan actually testified at trial that Petitioner touched him around five
times.  (Lodgment No. 6 at 4.)

14cv1080

### c. **Marcus A. Declaration**

Marcus A.,[13] the alleged ringleader of the "testify against Ziskin for money" conversations, signed a declaration on March 22, 2011.  (Arguelles Decl., Lodgment No. 17 vol. 3, Ex. 7.)  He states,

> The incident occurred right after the Michael Jackson molestation case.  Myself and the other kids thought we could make a lot of money in this case also.  What started as a game became serious, and we couldn't back down.  We made a mistake, but being so young, most of us were 12-13 years of age, we didn't know any better, and instead of backing off, we made it worse by making outlandish allegations against our teacher Peter Ziskin.

(Id.)[14]

### d. **Declarations of Eric Molho, Kalara Wilk, Victoria Draper Stubblefield, Mary Jo Blaze, William Bradler, Claire Molho, Shelby Atkins, Sheila Atkins, Mary Jo Scott, and Donald Ziskin**

Petitioner's "new" evidence includes ten declarations regarding the boys allegedly testifying for money, the boys' demeanor at school, and students "jumping on the bandwagon" to make allegations against Petitioner.  It is important to note that five of the witnesses are not "new" at all, as they testified on Petitioner's behalf at trial (Sheila Atkins, Shelby Atkins, Eric Molho, William Bradler, and Mary Jo Blaze) and presumably had an earlier opportunity to inform Petitioner's defense team of their observations, now being presented as new evidence, dated six years after Petitioner's trial.

Eric Molho, a former student at Rincon, states there was constant talk at school about kids making money by saying Petitioner had touched them.

---

[13] Marcus's full name is Marcus Arguelles.

[14] Although Marcus testified at Petitioner's preliminary hearing on September 8, 2005 (see Lodgment No. 17 vol. 3, Ex. 8), for reasons unclear in the record before the Court, the prosecutor elected not to seek charges against Petitioner in relation to Marcus.

14cv1080

(Lodgment No. 17 vol. 3, Ex. 21.)  Gabe F. told him, "Oh, yeah, I'm in this for the money."  (Id.)  Kalara Wilk, a former student at Rincon, attests that the boys, and especially Gabe and Luis, had "smug" expressions on their faces, and the boys made jokes about Petitioner and the situation all the time, likening Petitioner to Michael Jackson.  (Id., Ex. 22.)  Victoria Draper Stubblefield, a teacher at Rincon, states the boys involved in the case, that she had in her class, laughed, talked, and made innuendos about the case all the time.  (Id., Ex. 23.)  She believes, "[T]his was a big joke to these kids."  (Id.)  Mary Jo Blaze, a teacher at Rincon, states that another teacher told her, "I wouldn't believe any of these kids," because the boys discussed getting money from the case and the things they were going to buy with the money.  (Id., Ex. 24.)  She also observed Petitioner roughhousing with students:  "I saw him once with a kid over his head, and yes, his hand was inside the waist area of the kid's pants, but that was only so he didn't drop the kid."  (Id.)  William Bradler, a former student at Rincon whose family was close to Petitioner, states there was a "buzz" around school about how the kids would be getting money, and it felt like everyone was "jumping on the bandwagon."  (Id., Ex. 25.)  He also attests that he spent "an enormous amount of unsupervised time alone" with Petitioner and Petitioner never acted inappropriately.  (Id.)

Claire Molho, a school volunteer (her son is Eric Molho, discussed above), attests that the one of the children being questioned by police detectives at school "stormed out of the office clearly upset," looked back, and yelled, "I told you that nothing happened!"  (Id., Ex. 26.)  She heard "scuttlebutt" around the school that the kids were getting money for testifying.  (Id.)  Shelby Atkins, a former student at Rincon, overheard approximately six boys hanging out at school, laughing and joking, saying they were going to tell the police that Petitioner had "grabbed their junk" so

he would get fired.  (Id., Ex. 27.)   The boys stated they hated Petitioner and this would be a good way to get rid of him.  (Id.)  Sheila Atkins, Shelby's mother, attests that her daughter was very upset by the allegations and told her before Petitioner was arrested that the boys were going to make things up to get Petitioner fired.  (Id., Ex. 28.)  Susan Scott, a teacher at Rincon, states that students who accused Petitioner were allowed to talk to each other in between giving their statements to school administrators and/or the police.  (Id., Ex. 29.)  She told the vice principal, "You can't take these kids out and bring them back to talk to the other kids because they are all talking to one another; they are contaminating each interview."  (Id.)  She is unable to provide the names of the students who spoke with one another and would have to see a yearbook to do so.  (Id.)  Donald Ziskin, Petitioner's cousin, attests that victim Nick G. filed a lawsuit against Petitioner and the Escondido School District, alleging that Petitioner had touched him during the interval between instructional aide Nancy Kramar's witnessing of incidents involving Petitioner and when she reported the incidents to school administrators, thereby subjecting the school district to liability, as the lawsuit claimed the school, via Ms. Kramar, had notice of the allegations but failed to act upon them.  (Id., Ex. 30.)

### e.   **Analysis**

The Court has reviewed the evidence cumulatively, and has thoroughly considered the additional evidence proffered by Petitioner and its potential exculpatory effect.  The Court finds that Petitioner has not made the showing required by Schlup that he is actually innocent, as he has not shown that his new evidence undermines the evidence presented at trial to such a degree that no reasonable juror, considering fairly all the evidence presented, would convict him.

The gist of Petitioner's new evidence is that the boys who accused

14cv1080

Petitioner of touching them were motivated by the prospect of receiving money, planned collectively to say that Petitioner had touched them, and did not tell the truth at trial.  The Court has carefully reviewed the trial testimony of each of the victims and finds the testimony is not indicative of shared, planned stories.  Although the boys' testimony was certainly similar and consistent in many respects, it was not so identical as to appear to have been contrived.  The boys' stories had varying details, including about the touchings, and the boys used different terminology to describe which parts of their bodies had been affected.  Importantly, many of the boys acknowledged details that would not be considered favorable to or consistent with their accusations, such as that they liked Petitioner as a teacher, they initially thought the touches were accidental, and they kept seeking Petitioner out to "wrestle" even after touches had occurred.  In the Court's view, the boys' testimony rings of truth, not of perjury.  Moreover, evidence other than the boys' testimony implicated Petitioner, including Kramar's observations ("His hand was inside the boy's pants and pretty deep because he had to struggle to get it out") and that one of the victims observed by Kramar, David, was questioned by assistant principal Marty Hranek on the very day of Kramar's report, before anyone knew about any accusations against Petitioner, and confirmed Kramar's observations. (Lodgment No. 1, RT vol. 4, 549; vol. 5, 610.)

The state habeas court did not believe the testimony of either Juan M. or his mother to be accurate or candid (Lodgment No. 15 at 3), and this Court finds the same.  Ms. Mendez's testimony contained a marked number of inconsistencies, and she appeared to be guided by her longstanding belief in Petitioner's innocence.  There is also a discrepancy between Juan's and his mother's testimony about whether the boys were speaking in English or Spanish during the courthouse conversation,

14cv1080

bringing into question whether Ms. Mendez actually heard or understood the conversation, and whether the conversation really ever occurred. Juan's testimony appears to have been motivated by his conflicted and guilty feelings about having testified against Petitioner, as well as his desire to help Petitioner, as evidenced by his reaching out to the other boys who had been involved in the case for their assistance in Petitioner's habeas proceedings.

Even assuming *arguendo* that the testimony of Ms. Mendez and Juan at the state court habeas evidentiary hearing was completely credible, it was not wholly inconsistent with the testimony that Juan provided at Petitioner's trial, and has not caused the court to lose confidence in the outcome of the trial. Although Juan now claims he did not tell the truth at the trial, only a small portion of his new testimony contradicts what he said at trial. For example, at trial, he testified that Petitioner touched him on more than five occasions. He now says Petitioner touched him "hand-to-skin" on only one occasion. He does not refute, however, that Petitioner grabbed him by the waistband of his pants when they wrestled on many other occasions. Juan now claims that he never felt "molested," despite having testified that he felt the touching was "bad." As an adult with the benefit of life experience, as well as an understanding of the full consequences of having testified against Petitioner, Juan believes that Petitioner had no sexual motivation when he wrestled with Juan or touched his genital area. Juan, however, is ascribing his own view of Petitioner's intent onto the events that transpired, and is speculating about Petitioner's intent. At trial, intent was one of the critical elements considered by the

14cv1080

jury.[15]  It was up to the jury to determine whether touching had occurred and if so, whether it was criminal, i.e., whether Petitioner had the requisite intent for committing lewd acts with children.  Juan's present-day belief about Petitioner's state of mind in the past does not change what the jury found in 2006.  And, even if Juan did commit perjury at trial by saying he felt the touching was "bad" even though he did not truly feel that way, the crime of lewd act upon a child does not contain an element relating to the child victim's state of mind, nor the victim's belief about the perpetrator's state of mind.  See Cal. Penal Code § 288, n. 15 supra.  In any event, although Juan apparently no longer believes the touching was "bad," he still acknowledges that touching occurred and that it was "weird," which is consistent with his testimony at trial.

Marcus's statement is far from conclusive evidence that all of the boys committed perjury at trial when they testified that Petitioner touched them.  Marcus, who did not even testify at the trial as the prosecutor did not proceed with charges filed against Petitioner on his behalf, provides only a vague declaration that does not even establish that he lied about or exaggerated his account of what happened with Petitioner, let alone establish that all the boys did.  Marcus' s declaration, alone or in conjunction with the other new evidence presented by Petitioner, does not constitute evidence of actual innocence, or "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial . . . ." Stewart, 757 F.3d at 937.

As for the other evidence, consisting of declarations, that the boys believed they would receive money for testifying against Petitioner, even if

---

[15]Cal. Penal Code § 288(a) provided that "any person who willfully and lewdly commits any lewd or lascivious act . . . upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child, is guilty of a felony . . . ."

it were demonstrated the boys held this belief (and this has not been shown because none of the declarations provided are from the victims, other than Juan, but rather are from third parties), this would not establish Petitioner's actual innocence as it does not establish that the boys fabricated their stories and committed perjury at trial.  There is no indication the conversations about receiving money, even if they occurred, resulted in any exaggeration or such an exaggeration of the truth that Petitioner would not have been convicted had the conversations not occurred.  Additionally, testimony provided at trial refutes the notion that all of the boys talked about their court testimony with the other victims.  When asked at trial if they had spoken with other students about what they had planned to say in court, David, Luis, and Charles replied they had not.  (Lodgment No. 1, RT vol. 3 at 228, 317 & RT vol. 4 at 361.)

Importantly, Juan testified at the evidentiary hearing that the idea of receiving money came up *after* he and the other boys had already spoken to police detectives about Petitioner touching them.  Moreover, Juan testified at trial, and still acknowledges today, that Petitioner touched him. The jury found the touching occurred with criminal intent.  Even if evidence of the boys' conversations in the courthouse and elsewhere had been presented to the jury, it cannot be said that Juan's belief, and the other boys' apparent belief, that they were going to receive money because they had been touched would have affected the jury's findings.  Similarly, it cannot be said that evidence concerning the boys' demeanor at school, which is subjective and speculative in nature, would have affected the jury's findings, considering all of the evidence as a whole.

In sum, the new evidence proffered by Petitioner is insufficient to establish his actual innocence.  The Court does not conclude "that it is more likely than not that no reasonable juror would have convicted

14cv1080

[Petitioner] in the light of [this] new evidence." See McQuiggin, 133 S.Ct at 1935.  The Schlup inquiry requires the federal court to assess how reasonable jurors would react to the overall, newly supplemented record. House, 547 U.S. at 538.  For all of the reasons discussed above, the Court believes the jury still would have convicted Petitioner even if it had heard all of the above evidence, and cannot say that it no longer has confidence in the outcome of the trial.  See Stewart, 757 F.3d at 937; Schlup, 513 U.S. at 316.  The Court finds Petitioner has not made a credible claim of actual innocence that excuses the untimely filing of his federal habeas petition.

## III.    Conclusion and Recommendation

For the foregoing reasons, this Court hereby recommends that Respondent's motion to dismiss be **GRANTED**, that the Petition be **DISMISSED WITH PREJUDICE**, and that judgment be entered accordingly.

This Report and Recommendation is submitted to the Honorable Thomas J. Whelan, United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  **IT IS ORDERED** that not later than February 19, 2015, any party may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."  **IT IS FURTHER ORDERED** that any reply to the objections shall be served and filed not later than March 2, 2015.  The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.  See Turner v. Duncan, 158 F.3d

//

//

14cv1080

449, 455 (9th Cir. 1998); <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

**IT IS SO ORDERED.**

DATED:  February 5, 2015

Jan M. Adler
U.S. Magistrate Judge