1
2
3                    UNITED STATES DISTRICT COURT
4                  SOUTHERN DISTRICT OF CALIFORNIA
5
6  PETER T. ZISKIN,                      | CASE NO: 14-CV-1080 W (JMA)
7                          Petitioner,   | ORDER:
8
9  v.                                    | (1) ADOPTING REPORT AND
                                         | RECOMMENDATION [DOC. 13];
10
11                                       | (2) GRANTING RESPONDENT'S
                                         | MOTION TO DISMISS [DOC. 8];
12
13 MARION SPEARMAN, Warden,              | (3) DISMISSING PETITION FOR
                                         | HABEAS CORPUS RELIEF WITH
14                         Respondent.   | PREJUDICE  [DOC. 1]; AND
15
16                                       | (4) DENYING CERTIFICATE OF
                                         | APPEALABILITY

17       On April 29, 2014, Petitioner Peter T. Ziskin, a state prisoner proceeding with

18 counsel, filed a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 (the

19 "Petition") challenging his conviction for seventeen felony counts of committing a lewd

20 act upon a child in violation of California Penal Code § 288(a).  (*Pet.* [Doc. 1] 1–2.)[1]

21 Petitioner received a sentence of fifteen years to life on each count to run concurrently.

22 (*Id.* at 1.)  On June 3, 2014, Respondent moved to dismiss the Petition, arguing that it

23 should be dismissed with prejudice because it is barred by the statute of limitations under

24 28 U.S.C. § 2244(d)  (*MTD* [Doc. 8]).  Petitioner opposed.  (*Pet'r's Opp'n* [Doc. 12].)

25

26       [1] The Petition consists of a form petition and numerous addendums, a memorandum of
27 points and authorities in support of the Petition, and a declaration of Petitioner's current counsel,
   E. Thomas Dunn, Jr.  (*See Pet.*; *Dunn Decl.* [Doc. 1].)  Because the Petition constitutes a single filing
28 that includes multiple documents with unique pagination, the Court will use the CM/ECF
   pagination when citing to these documents.

On February 5, 2015, United States Magistrate Judge Jan M. Adler issued a Report and Recommendation (the "Report") recommending that the Petition be dismissed with prejudice. (*Report* [Doc. 13].) Thereafter, Petitioner objected to the Report. (*Pet'r's Obj.* [Doc. 16].) Respondent did not reply to Petitioner's objections.

The Court has considered the matter on the papers filed and without oral argument. See S.D. Cal. Civ. L. R. 7.1(d.1). For the reasons discussed below, the Court **ADOPTS** the Report with some additional explanation, **GRANTS** Respondent's motion and **DISMISSES** the Petition **WITH PREJUDICE**, and **DENIES** a certificate of appealability.

## I.   BACKGROUND

The parties do not dispute the facts as presented in the Report. Thus, the Court will cite to the Report and briefly summarize those facts here.

In 2004 and 2005, Petitioner was employed as a teacher at Rincon Middle School in Escondido, California. (*Report* 10:17–18.) After a series of events that occurred during Petitioner's employ at the school, Petitioner was charged with twenty-six counts of lewd act upon a child in violation of California Penal Code Section 288(a). (*Id.* at 2:1–5.) The following is a condensed summary of the evidence presented at trial[2]:

> Ziskin's male students would frequently wrestle with him, initiating the activity by jumping on him and laughing. Ziskin would lift the boys up, flip them over his shoulder, and spin them around. The lewd touching typically occurred during the course is this activity.

> On January 14, 2005, instructional aide Nancy Kramar was in Ziskin's

---

[2] The summary, in its entirety, originally appeared in the April 23, 2008 California Court of Appeal decision <u>People v. Ziskin</u>, No. D049152, slip op. (Cal. Ct. App. Apr. 23, 2008), wherein Petitioner's direct appeal was denied. (*See* Lodgment 6 [Doc. 9-27].) The full summary, unlike the condensed version presented here, includes facts related to each victim. (*See id.* at 2–7.) The Report adopts the summary in its entirety (*See Report* 10:13–13:28, 10 n.6), and this Court likewise adopts and incorporates it by reference.

classroom assisting students.  After the bell rang and only a few students were in the classroom, Kramar saw Ziskin pick up a boy and swing him around, with his hand touching "outside [the boy's] pants in the area of the crotch." Kramar felt uncomfortable about her observation.  On January 18, 2005, Kramar went to Ziskin's classroom during Ziskin's lunch period to leave him a message about a change in her assignment.  When she walked into the classroom, Ziskin was holding a boy (David) on his shoulders and spinning the boy around.  When Ziskin saw Kramar, he put the boy down. Kramar saw Ziskin's hand "struggle a couple of times as he tried to get his hand out of the boy's pants."  Kramar observed Ziskin's hand was "pretty deep" inside the front of David's pants because he had to struggle to get it out.  There were no other people in the room other than Ziskin and David. Kramar reported the incidents to the school administration.

During the ensuing investigation, numerous boys (including David) revealed that on some occasions while wrestling with Ziskin in the classroom, Ziskin put his hand in their pants and touched their penises.

. . . .

In his defense, Ziskin presented numerous character witnesses who testified that they frequently observed Ziskin play with children and never observed any inappropriate touching.  Further, two defense experts (Dr. Phillip Esplin and Thomas Streed) testified regarding factors that affect memory and create suggestibility.  During its rebuttal case, the prosecution presented four taped interviews of the victims that were made during the case investigation.  In surrebuttal, Dr. Streed opined that one of the taped interviews was conducted in a suggestive manner.

(*Id.* at 10:18–13:11 (quoting <u>Ziskin</u>, No. D049152, slip op. at 2–7).)

On May 31, 2006, a jury convicted Petitioner of seventeen of the twenty-six counts. (*Report* 2:7–10.)  The trial court sentenced Petitioner to fifteen years to life on each of the seventeen counts, to run concurrently.  (*Id.* at 2:14–17.)  Thereafter, Petitioner appealed. The California Court of Appeal affirmed the convictions and sentence on April 23, 2008.  (*Id.* at 2:18–20.)  After Petitioner sought rehearing of that decision, the appellate court modified its opinion and denied rehearing of the appeal on May 8, 2008. Petitioner subsequently sought review before the California Supreme Court.  The petition for review was denied without comment on July 23, 2008.  (*Id.* at 2:20–25.) *//*

1   Next, Petitioner filed his state habeas petition with the San Diego Superior Court

2   on October 22, 2009.  It was ultimately denied on April 27, 2012 after an evidentiary

3   hearing was conducted in early 2012.  (*Report* 2:26–3:4.)  On August 14, 2012, Petitioner

4   filed a habeas petition with the California Court of Appeal.  It was denied on October

5   3, 2012.  Then, Petitioner filed a petition for review with the California Supreme Court.

6   On December12, 2012, it too was denied.  (*Id.* 3:11–16.)

7   Petitioner filed the instant Petition with this Court on April 29, 2014, in which

8   he set forth four claims: (1) ineffective assistance of counsel based on trial counsel's

9   failure to advise him of his right to testify; (2) actual innocence based on newly

10  discovered evidence; (3) prosecutorial misconduct based on the prosecutor's failure to

11  disclose exculpatory evidence; and (4) deprivation of Due Process based on the trial

12  court's error in allowing the prosecutor to shift the burden of proof.  (*Pet.* 9–12.)  On

13  June 3, 2014, Respondent moved to dismiss the petition as untimely.  (*See MTD.*)

14  Thereafter, Petitioner filed his opposition.  (*See Pet'r's Opp'n.*)

15  On February 5, 2015, Magistrate Judge Adler issued the Report recommending

16  that this Court grant Respondent's motion and dismiss the Petition as untimely.  (*See*

17  *Report.*)  On March 3, 2015, Petitioner filed his objections.  (*See Pet'r's Obj.*)  Respondent

18  did not file a reply.

19

20  **II.   LEGAL STANDARD**

21  The duties of the district court in connection with a magistrate judge's report and

22  recommendation are set forth in Rule 72(b) of the Federal Rules of Civil Procedure and

23  28 U.S.C. § 636(b)(1).  The district court "shall make a de novo determination of those

24  portions of the report . . . to which objection is made," and "may accept, reject, or

25  modify, in whole or in part, the findings or recommendations made by the magistrate."

26  28 U.S.C. § 636(b); see also United States v. Remsing, 874 F.2d 614, 617 (9th Cir.

27  1989); United States v. Raddatz, 447 U.S. 667, 676 (1980).  When no objections are

28  filed, the district court is not required to review the magistrate judge's report and

1   recommendation.  See United States v. Reyna-Tapia, 328 F.3d 1114, 1121 (9th Cir.

2   2003) (holding that 28 U.S.C. 636(b)(1)(c) "makes it clear that the district judge must

3   review the magistrate judge's findings and recommendations de novo *if objection is made,*

4   but not otherwise" (emphasis in original)).

5

6   **III.   DISCUSSION**

7        Petitioner objects to the Report on three grounds.  First, Petitioner contends the

8   Report's finding that equitable tolling does not apply is based on conclusory analysis

9   ignoring relevant facts in the record and in Mr. Dunn's original declaration

10  accompanying the Petition. (*See Pet'r's Obj.* 1:22–5:22.) Second, Petitioner objects to the

11  Report because it purportedly uses an "assumed lack of diligence" on the part of

12  Petitioner to defeat the application of the "actual innocence" exception to the AEDPA's

13  statute of limitations.  (*Id.* at 5:23–6:6 (citing McQuiggin v. Perkins, 133 S. Ct. 1924

14  (2013)).)  Third, Petitioner argues that the Report uncritically and unreasonably accepts

15  prosecution evidence, and improperly rejects new defense evidence in a conclusory

16  fashion. (*Id.* at 6:7–8:25.)  The Court addresses each of these objections in turn below.

17

18       **A.     Petitioner's Objection to the Report's Equitable Tolling Analysis**

19       Petitioner first contends that he "has never conceded the issue of whether

20  equitable tolling applies."[3]  (*Pet'r's Obj.* 1:27–28.)  In his opposition to Respondent's

21  motion, Petitioner stated: "Whether equitable tolling . . . . might apply . . . is *not* the issue

22  presented here.  That Petitioner has not relied on statutory or equitable tolling is made

23  clear in the Petition and the Declaration attached to it." (*Pet'r's Opp'n* 4:1–4.)  Then, in

24

25       [3] Before reaching the equitable tolling issue, the Report examines whether statutory tolling

26  applies, and concludes that it does not. (*See Report* 5:16–6:26.)  Then, after finding equitable tolling
    to be likewise inapplicable, the Report finds Petitioner is not entitled to "delayed accrual" under 28

27  U.S.C. § 2244(d)(1)(D).  (*Id.* at 7:24–8:11.)  Petitioner does not challenge the Report's findings as

28  to statutory tolling or delayed accrual, and the Court agrees with the Report's analysis of those issues.
    Thus, the Court **ADOPTS** the Report's findings on those points.

1    a footnote, Petitioner explained he was "*not* conceding the point about whether equitable
2    tolling would be appropriate here ." (*Id.* 4 n.2.)  Instead, he explained that "the Petition
3    was prompted by newly discovered evidence which demonstrates Petitioner's factual
4    innocence and premised on the exception discussed in <u>McQuiggin</u>."  (*Id.*)

5          Now, in his objection to the Report, Petitioner argues that the Report improperly
6    seizes on the above statements.  (*Pet'r's Obj.* 1:28–2:5 (quoting *Pet'r's Opp'n* 4 n.2).)
7    Petitioner claims that while the Petition is premised on evidence of actual innocence, he
8    "has never suggested that equitable tolling should *not* be applied." (*Id.* at 2:6–8 (emphasis
9    added).)  Petitioner cites the record, Mr. Dunn's original declaration attached to the
10   Petition, Mr. Dunn's supplemental declaration,[4] and evidence provided along with his
11   objections, as support for his conclusion that equitable tolling *does* apply.  Based on these
12   contentions, Petitioner claims that he never waived the equitable tolling issue, and that
13   the Magistrate or this Court should reassess the issue.  (*Id.* at 5:14–22.)

14

15         1.    *AEDPA's Statute of Limitations and Statutory Tolling*

16         Under the AEDPA, "a state prisoner seeking a federal habeas corpus remedy
17   [must] file his federal petition within one year after his state conviction has become
18   'final.'"  <u>Carey v. Saffold</u>, 536 U.S. 214, 216 (2002).  As discussed in the Report, 28
19   U.S.C. § 2244(d)(1) provides as follows:

20

21         A 1-year period of limitation shall apply to an application for a writ of
22         habeas corpus by a person in custody pursuant to the judgment of a State
             court.  The limitation period shall run from the latest of–

23
                  (A) the date on which the judgment became final by the conclusion
24                of direct review or the expiration of the time for seeking such review;
25                . . .

26   _____

27         [4] Mr. Dunn's supplemental declaration is attached to Petitioner's opposition to Respondent's
     motion to dismiss.  (*See Dunn Suppl. Decl.* [Doc. 12].)  Again, because the opposition and
28   supplemental declaration were submitted in a single filing, the Court will use the CM/ECF
     pagination when referring to those respective documents.

28 U.S.C. § 2244(d).[5]  In Clay v. United States, the Supreme Court defined the meaning of "finality" in the context of post-conviction relief, explaining that "finality" attaches to a case "when [the Supreme Court] affirms a conviction on the merits on direct review or denies a petition for a writ of certiorari, or when the time for filing a certiorari petition expires."  537 U.S. 522, 527 (2003); see Bowen v. Roe, 188 F.3d 1157, 1158–59 (9th Cir. 1999).  According to the rules of the Supreme Court, "a petition for a writ of certiorari to review a judgment in any case, civil or criminal, entered by a state court of last resort . . . is timely when filed with the Clerk of this Court within 90 days after entry of the judgment."  S. Ct. R. 13; see also Bowen, 188 F.3d at 1159 (citing S. Ct. R. 13).

The Report explains, and Petitioner does not dispute, that direct review of Petitioner's convictions ended on July 23, 2008.  (*Report* 2:23–25, 5:3–5.)  After adding ninety days to that date, the Report correctly concludes that Petitioner's conviction became final on October 21, 2008.  Petitioner then had one year under the AEDPA, until October 21, 2009, to file his federal habeas petition.  (*Id.* at 5:6–11.)  However, Petitioner did not file the instant Petition until April 29, 2014.

The Report proceeds to explain that a petitioner may be entitled to statutory tolling of the one-year limitations period for "time during which a properly filed application for State post-conviction or other collateral review . . . is pending."  (*Report* 5:17–19 (quoting 28 U.S.C. § 2244(d)(2)).)  Yet, because Petitioner did not file his state habeas petition until October 22, 2009, which was one day *after* the AEDPA limitations period had run,[6] the Report correctly concludes that "the pendency of that petition, or

_____

[5]  In addition to subparagraph (A), 28 U.S.C. § 2244(d) contains subparagraphs (B), (C), and (D).  However, Petitioner does not argue that those provisions apply here.

[6]  Contrary to the Report's findings, Petitioner claims that October 22, 2009 "was a date that would have preserved time for federal review."  (*Pet'r's Obj.* 2:19–20; *see also Dunn Decl.* 16:20–21.)  The Court's review of the relevant dates indicates that Petitioner is mistaken.  Additionally, Petitioner seems to have previously made a contradictory assertion when he explained:

Petitioner diligently sought and employed counsel to file his initial state habeas petition in early 2009 . . . however, his counsel . . . disappeared, making case files

14cv1080w

1   any other habeas petition filed subsequently by Petitioner, could not [statutorily] toll the

2   already-expired limitations period pursuant to 28 U.S.C. § 2244(d)(2)."[7]  (*Id.* at 6:6–16

3   (citing, *inter alia*, <u>Jiminez v. Rice</u>, 276 F.3d 478, 482 (9th Cir. 2001)).)

4

5       2.   *Equitable Tolling*

6       Next, the Report briefly addresses the issue of equitable tolling.  After noting that

7   Petitioner had failed to make an equitable tolling argument either in the Petition or in

8   the opposition to Respondent's motion, the Report concludes that Petitioner did not

9   meet his burden of demonstrating the requisite diligence or extraordinariness to trigger

10  the applicability of equitable tolling.  (*Report* 7:21–23.)  Petitioner contends that the

11  Report's determination as to this issue is faulty because "the Magistrate cites no relevant

12  fact from the record, nothing at all except the fact that Petitioner has not conceded the

13  issue." (*Pet'r's Obj.* 3:4–12.)  The Court agrees with the Report's conclusion.

14      In <u>Holland v. Florida</u>, the Supreme Court held that "the timeliness provision in

15  the federal habeas corpus statute is subject to equitable tolling."  560 U.S. 631, 634

16  (2010) (citing 28 U.S.C. § 2244(d)).  "[A] litigant seeking equitable tolling bears the

17  burden of establishing two elements: (1) that he has been pursuing his rights diligently,

18  and (2) that some extraordinary circumstance stood in his way."  <u>Pace v. DiGuglielmo</u>,

19

20      inaccessible, and failed to file the initial petition in a California court until October
21      22, 2009.  After that, [counsel] abandoned [Petitioner], requiring that new counsel
        be employed.  By then, the one-year statute of limitations had run.

22  (*Pet'r's Opp'n* 3 n.1.)  Furthermore, the new evidence that Petitioner has submitted along with his
    objections to the Report seems to acknowledge that October, 21, 2009—not October 22, 2009—was

23  the date on which Petitioner's state habeas petition needed to be filed to preserve time to file a

24  federal habeas petition. (*See Bruce Ziskin Decl.* [Doc. 16-1] ¶ 2.)

25      [7] The Report went on to explain that "[e]ven assuming Petitioner's first state habeas petition
    was timely filed, and [statutory] tolling was in effect until the California Supreme Court's denial of

26  the petition for review on December 12, 2012, more than one year elapsed between [that date] and
    April 29, 2014, when Petitioner filed his federal habeas petition." (*Report* 6:17–23.)  Thus, the

27  Court agrees with the Report that unless Petitioner is entitled to equitable tolling or some other
    means of extending or circumventing the one-year limitations period, that period expired on

28  October 21, 2009.  (*Id.* at 6:24–26.)

544 U.S. 408, 418 (2005) (citation omitted).  The requisite diligence for equitable tolling is "reasonable diligence" as opposed to "maximum feasible diligence."  Holland, 560 U.S. at 653 (citations and internal quotation marks omitted).  Moreover, the term "'extraordinary circumstances' necessarily suggests the doctrine's rarity."  Waldron-Ramsey v. Pacholke, 556 F.3d 1008, 1011 (2009).  In order to demonstrate the existence of "extraordinary circumstances," a litigant must show that "an external force . . . cause[d] the untimeliness."  Id.  Mere "oversight, miscalculation or negligence" on the part of a petitioner "would preclude the application of equitable tolling."  Harris v. Carter, 515 F.3d 1051, 1055 (9th Cir. 2008).

"[E]quitable tolling is unavailable in most cases."  Miranda v. Castro, 292 F.3d 1063, 1066 (2002) (citation and internal quotation marks omitted).  It is "appropriate only 'if *extraordinary* circumstances beyond a prisoner's control make it *impossible* to file a petition on time.'"[8]  Id. (citations omitted).  Thus, "the threshold necessary to trigger equitable tolling (under AEDPA) is very high, lest the exceptions swallow the rule."  Id. (citing United States v. Marcello, 212 F.3d 1005, 1010 (7th Cir. 2000)) (internal quotation marks omitted); see also Pacholke, 556 F.3d at 1011.

Here, Petitioner simply did not make the requisite showing.  Although Petitioner is correct in that he "has never suggested that equitable tolling should *not* apply," he never met his burden of showing that it does apply.  The Supreme Court has clearly explained that "*a litigant* seeking equitable tolling *bears the burden of establishing*" diligence and extraordinary circumstances.  Pace, 544 U.S. at 418 (emphasis added) (citation omitted).  Accordingly, it was incumbent on Petitioner—not the Magistrate—to cite relevant facts.  The mere attachment of Mr. Dunn's declaration to the Petition (*see Dunn*

---

[8]  The Court recognizes that the "impossibility" standard is still applicable in this Circuit notwithstanding the Supreme Court's decision in Holland.  See Gibbs v. Legrand, 767 F.3d 879, 888 n.8 (9th Cir. 2014) (quoting Sossa v. Diaz, 729 F.3d 1225, 1229 (9th Cir. 2013)).  However, since Holland, the Ninth Circuit "ha[s] applied this . . . standard leniently, rejecting a literal interpretation."  Id. (citations omitted).  The Court heeds this development in its review of the equitable tolling issue.

1    *Decl.* 16–17), the assertions in the first footnote in Petitioner's opposition to

2    Respondent's motion (*see Pet'r's Opp'n* 3 n.1), and Mr. Dunn's supplemental declaration

3    (*see Dunn Suppl. Decl.* 8:1–28) were insufficient.

4        It was also incumbent on Petitioner to proffer argument and cite relevant authority

5    as to why such facts demonstrate the requisite diligence and extraordinariness, as those

6    terms have distinct meanings in light of relevant case law. For example, Petitioner never

7    adequately explained why circumstances beyond his control made it "impossible" to

8    file—or extremely unlikely that he would file, see, e.g., Gibbs, 767 F.3d at 888—a timely

9    petition. Furthermore, Petitioner alluded to imprecise time periods for which he claimed

10    to be entitled to equitable tolling, but he did not adequately specify distinct dates or how

11    the requisite extraordinariness and diligence might apply to distinct periods of time. (*See,*

12    *e.g., Dunn Decl.* 17:1–17.) In light of these defects, the Court must agree with the

13    Report's conclusion that Petitioner failed to meet the lofty threshold necessary to trigger

14    equitable tolling. See Miranda, 292 F.3d at 1066; Pacholke, 556 F.3d at 1011.

15

16       3.    *Additional Facts Attached to Petitioner's Objections*

17        Petitioner now seeks to introduce new evidence on the equitable tolling issue by

18    way of his objections. (*See Pet'r's Obj.* 4:15–5:13.) Petitioner has attached a declaration

19    of his first cousin, Bruce Ziskin ("Bruce"), as well as a series of exhibits.[9] The declaration

20    explains that Bruce has acted as Petitioner's representative outside of prison since

21    September 2008. (*See Bruce Ziskin Decl.*) It also details Bruce's and others' efforts to

22    move Petitioner's state and federal habeas petitions forward. (*See id.*) The corresponding

23    exhibits consist of letters and emails between Bruce and Petitioner's attorneys

24    documenting Bruce's efforts. (*See Email Exs.* [Doc. 16-1] 10–61.)

25        In United States v. Howell, 231 F.3d 615, 621 (9th Cir. 2000), the Ninth Circuit

26    "adopted the rule . . . that 'a district court has discretion, but is not required, to consider

27

28       [9] Because Petitioner and his cousin, Bruce Ziskin, share the same surname, the Court will refer to Bruce Ziskin by his first name to avoid any confusion.

evidence presented for the first time in a party's objection to a magistrate judge's recommendation.'" Brown v. Roe, 279 F.3d 742, 744 (9th Cir. 2002) (quoting Howell). However, the Ninth Circuit emphasized "that in making a decision on whether to consider newly offered evidence, the district court must actually exercise its discretion, rather than summarily accepting or denying the motion." Howell, 231 F.3d at 621–22. The Court will address the new evidence; however, because such evidence is unavailing for reasons similar to those discussed above, the Court need only do so briefly.

### i.    Equitable Tolling Based on State Habeas Counsel's Conduct

Petitioner's current counsel, Mr. Dunn, explains he "recently learned that Petitioner's first appellate counsel, Geoffrey Morrison, had a substance abuse problem, and the reason he abandoned Petitioner and did not do the work for which he had been retained was attributable to his battles with alcohol and other substances to which he was addicted." (Pet'r's Obj. 4:15–18.) In support of these assertions, Mr. Dunn provides the Court with a URL link to an Internet blog whereon Mr. Morrison appears to acknowledge his issues with sobriety. (See id. at 4:18–21.) According to Mr. Dunn, the blog "supports what counsel advised the court [in a previous] Declaration—that Petitioner and his family were faced with insurmountable obstacles and . . . did everything . . . to overcome, but which, in the end, caused time to pass in a manner beyond their control." (Id. at 4:21–24.) Mr. Dunn then concludes that "[t]hese constitute extraordinary circumstances if ever there were any." (Id. at 4:24–25.) Noticeably absent from the foregoing, however, is any authority in support of Petitioner's position.

Attorney negligence and miscalculation of limitations periods do not constitute extraordinary circumstances warranting equitable tolling. See Lawrence v. Florida, 549 U.S. 327, 336–37 (2007); Gibbs v. Legrand, 767 F.3d at 885; Frye v. Hickman, 273 F.3d 1144, 1146 (9th Cir. 2001) (citations omitted). Also, attorney "[n]on-responsiveness may be unprofessional, but it is hardly unheard of." Spitsyn v. Moore, 345 F.3d 796, 801 (9th Cir. 2003). Nevertheless, "attorney conduct compromising the filing of a timely

federal habeas petition can constitute the requisite 'extraordinary circumstance' in some circumstances but not others." Gibbs, 767 F.3d at 885. "[A]ttorney misconduct *can* be so egregious as to create an 'extraordinary circumstance,' justifying equitable tolling." Id. (citing Holland, 560 U.S. at 652). And, while it is the case that "agency law binds clients, including federal habeas petitioners, to their attorneys' negligence, 'a client cannot be charged with the acts or omissions of an attorney who has abandoned him.'" Id. (quoting Maples v. Thomas, 132 S. Ct. 912, 924 (2012)). "Nor can a client be faulted for failing to act on his own behalf when he lacks reason to believe his attorneys of record, in fact, are not representing him." Id.

Mr. Dunn's supplemental declaration states that "[t]he reason the federal statute of limitations ran before Petitioner could seek a writ from this court was due to [Morrison's] negligence and not due to any lack of diligence on Petitioner's part." (*Dunn Suppl. Decl.* 12:12–14.) Mr. Dunn then states that Morrison "disappeared" for an unspecified period of time, later filed the state habeas petition, and subsequently "abandoned" Petitioner. (*Dunn Suppl. Decl.* 12:17–20.) Again, Petitioner does not specify the exact time period for which he should be construed as having been "abandoned." That is, whether Petitioner should be afforded equitable tolling for some or all of the time in which Morrison was in his employ, or, because of Morrison's failures, the entire time for which his state habeas petition was pending in state court are questions Petitioner has left unanswered.

Furthermore, the email exhibits attached to Bruce's declaration, standing alone, do not clearly elucidate what Petitioner or his family believed about Morrison's representation, or that their reliance on Morrison from beginning to end was reasonable. For instance, the emails evince that around July 7, 2009, Petitioner and his family "feared [Morrison] was missing for good." (*See Bruce Ziskin Decl.* ¶ 9.) Morrison then resurfaced on July 8, 2009, only to miss another telephonic meeting he and Bruce scheduled for July 9, 2009. (*See Bruce Ziskin Decl.* ¶¶ 9–10; *Email Exs.* 41–61.) Thereafter, Bruce was unable reach Morrison until July 22, 2009. (*Bruce Ziskin Decl.* ¶ 10.) Nevertheless, Petitioner

1  continued to rely on Morrison notwithstanding his demonstrative unreliability and his

2  deviation from the previously discussed time line for filing Petitioner's state habeas

3  petition.  In other words, Petitioner has not clearly demonstrated that he is faultless for

4  failing to act on his own behalf when he had reason to believe Morrison was not

5  providing adequate representation.  Gibbs, 767 F.3d at 885.

6       Still, if all of the above *could* serve as a basis for equitable tolling in this case,

7  Petitioner does not cite a single case to support that notion, and he ultimately failed to

8  make the requisite showing that Morrison's actions were sufficiently egregious to trigger

9  equitable tolling.

10

11           *ii.*    *Equitable Tolling After December 12, 2012*

12       Even assuming Petitioner could avail himself of equitable tolling of the limitations

13  period until the California Supreme Court's December 12, 2012 denial of review of his

14  state habeas petition, such that he had a year from that date to file the instant Petition,

15  Petitioner still must demonstrate that he would be entitled to equitable tolling for some

16  additional period of time, as he did not file the instant Petition until April 29,

17  2014—more than sixteen months after his state post-conviction review came to an end.

18       After reviewing Bruce's declaration and related exhibits, the Court cannot

19  conclude that Petitioner is entitled to equitable tolling of any period of time between

20  December 12, 2012 and April 29, 2014.  According to Bruce, Petitioner and his family

21  concluded in early 2010 that Petitioner was without representation because, by that time,

22  Morrison had become completely non-responsive.  (*Bruce Ziskin Decl.* ¶¶ 12–13.)

23  Sometime thereafter, Petitioner retained a new attorney, Mr. Brent Romney.  (*See id.* ¶

24  14.)  Bruce states that despite Romney's promise of being "totally in" for Petitioner,

25  Romney was often unresponsive and ultimately "was unable to finish [Petitioner's]

26  federal habeas writ petition as promised, citing personal and medical issues."  (*Id.* ¶

27  14–16; *see Email Exs.* 59–61 (reflecting April 12, 2013 email from Romney).)  At that

28  juncture, Romney recommended Petitioner's current counsel, Mr. Dunn, who Bruce

1  "brought . . . on board" in April 2013. (*Bruce Ziskin Decl.* ¶ 16; *Email Exs.* 59–61.)

2      Bruce's declaration further explains that after retaining Mr. Dunn, he and Mr.
3  Dunn "were unable to contact . . . Romney again to arrange to have the case files
4  transmitted." (*Bruce Ziskin Decl.* ¶ 16; *see also Dunn Decl.* 17:4–12.) Bruce and Mr. Dunn
5  tried for months to obtain the case files, during which time Mr. Dunn made two trips
6  from Orange County to Riverside to collect the files.  On both occasions, the files were
7  not entirely ready to be picked up. (*Bruce Ziskin Decl.* ¶ 16; *see also Dunn Decl.* 17:4–12.)
8  Mr. Dunn received a portion of the record during his first trip to Riverside in June 2013,
9  and another portion during his second trip in July 2013. (*See Dunn Decl.* 17:5–11.)
10  Bruce then hired an investigator to obtain the remaining files. (*See Bruce Ziskin Decl.* ¶
11  16; *see also Dunn Decl.* 17:4–12.)  Mr. Dunn ultimately "obtained what remained of the
12  trial and appellate record (ten boxes full of additional documents)" in November 2013.
13  (*Dunn Decl.* 17:11–12.) And, as Mr. Dunn originally stated in his initial declaration, his
14  need to (1) review the record and all the evidence; (2) be in contact with Petitioner; and
15  (3) deal with the unexpected death of his mother-in-law in December 2013 resulted in
16  his filing the instant Petition at the earliest possible opportunity. (*Id.* at 17:13–17.)

17      The aforementioned facts are unavailing for a variety of reasons.  First, Petitioner
18  does not specifically identify the dates between December 12, 2012 and April 29, 2014
19  for which he believes the limitations period should be equitably tolled. (*See Pet'r's Obj.*)
20  Second, nowhere does Petitioner contend that any non-responsiveness on Mr. Romney's
21  part from December 12, 2012 until April 2013 amounted to "misconduct . . . so
22  egregious as to create an 'extraordinary circumstance,' justifying equitable tolling."
23  Gibbs, 767 F.3d at 885 (citation omitted).  Instead, Petitioner plainly claims that "the
24  problems with which [he] and his family have had to contend in dealing with flaky and
25  unresponsive counsel" are "extraordinary" and "far beyond the pale." (*Pet'r's Obj.*
26  5:10–13.)  Yet Petitioner cites no authority to support the notion that Mr. Romney's
27  purported "flakiness" should result in some period of equitable tolling.  In addition, the
28  new evidence presented reveals that Mr. Romney's decision to withdraw as counsel was

1   due in part to unpaid fees for past work and for future work on Petitioner's federal

2   habeas petition. (*See Email Exs.* 59–61.)

3        Third, notwithstanding Petitioner's averments regarding the circumstances he

4   faced, Petitioner never addressed the contentions in Respondent's motion to dismiss.

5   There, Respondent argued:

6

7        In this case, federal habeas corpus counsel certainly knows that he could
    have obtained the opinion on direct appeal from the California Court of
8   Appeal via an electronic service such as Westlaw or Lexis.   Indeed,
    Respondent had only to input the Court of Appeal's case number in
9   Westlaw in order to obtain a copy of the opinion. . . . This would have let
    counsel know what issues had been raised on[] direct appeal.  Additionally,
10  using the California courts[] website, counsel could have obtained the direct
    appeal case number and then gone to the California Court of Appeal to
11  obtain a copy of the opinion, thus, permitting counsel to at least have the
    background information in this matter.
12

13       Further, this case on direct appeal was from Division One located in

14  downtown San Diego.  Counsel is in Tusin, California, and could have
    copied the transcripts and briefs, either personally or via a copying service.
15  Claiming to have to wait for the record, at least the direct appeal record, is
    insufficient here.
16

17       Additionally, counsel could have also obtained the record for the

18  evidentiary hearing in the San Diego County Superior Court, which is
    located in Vista in North San Diego County, and closer to counsel, in the
19  same manner.

20       Finally, while a death is a painful experience, that is not sufficient to show

21  an extraordinary circumstance sufficient to justify equitable tolling.

22  (*See MTD* 20:1–21:5 (citing <u>Marcello</u>, 212 F.3d at 1010.)  Petitioner did not refute these

23  contentions in either his opposition to Respondent's motion or in his objections.  While

24  a petitioner's lack of access to his legal file may constitute an extraordinary circumstance

25  in certain situations, <u>see, e.g.</u>, <u>Ramirez v. Yates</u>, 571 F.3d 993, 998 (9th Cir. 2009),

26  Petitioner does not make an adequate showing that it does here.  What is more, in his

27  April 12, 2013 email, Romney stated:

28

- 15 -

> I will . . . forward the new attorney the draft of the federal petition which,
> I believe, will be of assistance to the new attorney as he/she prepares the
> petition for habeas relief in federal court.  In this way, the time needed for
> the new attorney to 'come up to speed' on [Petitioner's] case will be
> minimal."

(*Email Exs.* 60–61.)  This cuts against Petitioner's claim that he faced an extraordinary circumstance in or around April 2013.

Therefore, in light of the foregoing, the Court finds that the new evidence proffered by Petitioner at this advanced stage is insufficient to make the requisite showing of entitlement to equitable tolling.  See, e.g., Holland, 560 U.S. at 631.  That is, without more, Petitioner's assertion that he is entitled to equitable tolling falls short of the "very high" threshold necessary to trigger such tolling.  See Miranda, 292 F.3d at 1066 (citing Marcello, 212 F.3d at 1010).

**B.     The Report Does Not Erroneously Rely on an Assumed Lack of Diligence in Analyzing the *McQuiggin* Exception**

In setting out his second objection to the Report, Petitioner provides the following:

> The Magistrate correctly notes . . . that a petitioner's diligence is a factor the
> court can consider in evaluating the probable reliability of the evidence of
> actual innocence submitted.  Here, however, the danger is that the
> Magistrate's final determination about the evidence presented was affected
> by [the] conclusion that Petitioner failed the diligence test.  That
> assumption was erroneous and uninformed by facts that were before the
> [Magistrate], and doubtless, it impacted the Magistrate's view of the
> evidence at issue and Petitioner's credibility.

(*Pet'r's Obj.* 5:26–6:5.)

In McQuiggin, the Supreme Court explained that "[t]he miscarriage of justice exception . . . applies to a severely confined category: cases in which new evidence shows 'it is more likely than not that no reasonable juror would have convicted [the petitioner].'"  133 S. Ct. at 1933 (alterations in original) (quoting Schlup v. Delo, 513

1    U.S. 298, 329 (1995)).[10]  "Unexplained delay in presenting new evidence bears on the

2    determination whether the petitioner has made the requisite showing."  Id. at 1935.

3    Thus, "[a] court may consider how the timing of the submission and the likely credibility

4    of [a petitioner's] affiants bear on the probable reality of . . . evidence [of actual

5    innocence]."  Id. (alterations in original) (citation and internal quotation marks omitted).

6          Moreover, "[c]onsidering a petitioner's diligence, not discretely, but as part of the

7    assessment of whether actual innocence has been convincingly shown, attends to the

8    State's concern that it will be prejudiced by a prisoner's untoward delay in proffering new

9    evidence." McQuiggin, 133 S. Ct. at 1936.  For instance, while a prisoner could attempt

10   to lie in wait to invoke stale evidence in an effort to launch a collateral attack on his

11   conviction once a witness has died and is no longer able to rebut the new evidence, the

12   timing of such a petition "should seriously undermine the credibility of the actual-

13   innocence claim."  Id.

14         Here, Petitioner does not explain how the Report erroneously assumed that

15   "Petitioner failed the diligence test," or how that alleged assumption colored the Report's

16   assessment of the evidence presented in support of Petitioner's actual innocence claim.

17   (See Pet'r's Obj. 6:1–6.)  Petitioner only cites the Report's brief mention of "diligence" in

18   its explication of McQuiggin. (See id. at 5:26–6:1.)  Petitioner does not point to any other

19   portion of the Report's assessment of the actual innocence claim in which the Magistrate

20   even discusses "timeliness" or "staleness" of the new evidence.

21         Furthermore, the Court's review of the Report does not reveal any substantial

22   discussion of unexplained delay in presenting new evidence.  The Report's brief

23   discussion of timeliness appears limited to the observation that "five of the [new]

24   witnesses are not 'new' at all, as they testified on Petitioner's behalf at trial . . . and

25   presumably had an earlier opportunity to inform Petitioner's defense team of their

26   observations." (Report 19:17–22.)  Petitioner fails to demonstrate how that portion of the

27

28         [10]  The Court provides a more thorough explication of the law with respect to the
     "miscarriage of justice" exception in Part III.C. infra.

1   Report was erroneous.  Thus, in light of the above, and given that a court may consider

2   diligence as part of its assessment whether actual innocence has been adequately shown,

3   McQuiggin, 133 S. Ct. at 1396, the Report's assessment—to the extent that it included

4   a consideration of Petitioner's diligence in bringing the new evidence—appears sound.

5

6   ## C.   Applicability of the "Actual Innocence" Exception

7         Lastly, Petitioner urges the Court to reject the Report due to its allegedly uncritical

8   acceptance of prosecution evidence and alleged failure to properly assess Petitioner's new

9   evidence.  (*Pet'r's Obj.* 6:7–8:25.)   Petitioner contends these shortcomings led the

10  Magistrate to erroneously conclude that Petitioner failed to make the requisite showing

11  of actual innocence.  In support of this contention, Petitioner provides various examples

12  that he believes demonstrate the Report's failures in assessing the evidence.  (*See id.*)

13        In McQuiggin, the Supreme Court held that a claim of "actual innocence, if

14  proved, serves as a gateway through which a petitioner may pass" to have his petition

15  heard on the merits notwithstanding the expiration of the AEDPA's statute of

16  limitations. 133 S. Ct. at 1928. However, the Court also made clear "that tenable actual-

17  innocence gateway pleas are rare." Id.; Schlup, 513 U.S. at 324.  To avail oneself of this

18  gateway, "a petitioner 'must show that it is more likely than not that no reasonable juror

19  would have convicted him in the light of the new evidence,'" McQuiggin, 133 S. Ct. at

20  1935 (citation omitted), "or, to remove the double negative, that more likely than not any

21  reasonable juror would have reasonable doubt," House v. Bell, 547 U.S. 518, 538 (2006).

22  Such a showing is necessary to bring a petitioner "within the narrow class of cases . . .

23  implicating a fundamental miscarriage of justice."  Lee v. Lampert, 653 F.3d 929, 937

24  (9th Cir. 2011) (citations and internal quotation marks omitted).

25        In assessing a claim of actual innocence, "the habeas court must consider all the

26  evidence, old and new, incriminating and exculpatory, without regard to whether it

27  would necessarily be admitted under rules of admissibility that would govern at trial."

28  House, 547 U.S. at 537–38 (quoting Schlup, 513 U.S. at 327–28) (internal quotation

marks omitted).  The court must then "make 'a probabilistic determination about what reasonable, properly instructed jurors would do.'" Id. (quoting Schlup, 513 U.S. at 329). In making this assessment, "[a] court may consider how the timing of the submission and the likely credibility of [a petitioner's] affiants bear on the probable reality of . . . evidence [of actual innocence]."  Id. (alterations in original) (quoting Schlup, 513 U.S. at 332) (internal quotation marks omitted).   Accordingly, consideration of a petitioner's diligence can be made, "not discretely, but as part of the assessment whether actual innocence has been convincingly shown." McQuiggin, 133 S. Ct. at 1936.

After conducting its own review of the record and Petitioner's new evidence, the Court agrees with the Report's assessment and ultimate conclusion that Petitioner has failed to adequately demonstrate his actual innocence. (*See Report* 25:26–26:9.) Because the Court adopts in full the Report's analysis of Petitioner's actual innocence claim, the Court will limit its discussion of the issue to some of the examples mentioned in Petitioner's objections.

### 1.   *The Report's Reliance on the Testimony of Nancy Kramar*

According to the Report, "[t]he gist of Petitioner's evidence is that the boys who accused Petitioner of touching them were motivated by the prospect of receiving money, planned collectively to say that Petitioner had touched them, and did not tell the truth at trial." (*Report* 21:28–22:3.)  The Report then analyzes that evidence and explains that while the boys' stories were similar in some respects, they contained sufficiently distinct details to find that they were not contrived or perjurious. (*Id.* at 22:3–14.)  The Report also explains that "evidence other than the boys' testimony implicated Petitioner, including Kramar's observations," and that "one of the victims observed by Kramar, David, was questioned by assistant principal Marty Hranek on the very day of Kramar's report, before anyone knew about any accusations against Petitioner, and confirmed Kramar's observations." (*Report* 22:14–21 (citing *Lodgment* 1, *vol.* 4, 549; *vol.* 5, 610).) //

Petitioner contends that the Report improperly relies on the California Court of Appeal's "selective recitation" of Kramar's testimony. (*Pet'r's Obj.* 6:13–17.) Petitioner notes that Kramar (1) initially testified she was not sure what she had witnessed; (2) waited days to report her observations to Hranek; (3) is a mandated reporter who is required to immediately report incidents of the kind involved here; and (4) her delay in reporting discredits her later statement that what she observed Petitioner doing to David A. was the "worst thing" she had ever seen. (*Pet'r's Obj.* 6:13–28.) Thus, Petitioner appears to believe that the Report should not have given credence to Kramar's testimony.

As an initial matter, Petitioner cites no portion of the record to support the notion that "at first, when asked about what she saw, . . . Kramar said she was not sure." (*See Pet'r's Obj.* 6:16–17.) In fact, this Court's review of Kramar's testimony reveals that the opposite is true. (*See Lodgment* 1, *vol. 5*, 603–28.) Still, it is clear that Petitioner takes great issue with the fact that some time elapsed between the events Kramar observed on January 14 and January 18, 2009, and her subsequent report of those observations to Hranek on January 24, 2009. But even in light of Petitioner's "new" evidence, that time gap is insufficient to undermine the veracity of Kramar's testimony. Thus, the Court finds that the Report's reliance on Kramar's testimony, like the California Court of Appeal's reliance on it, was not improper.

2.    *Testimony of Rosa Colima Mendez*

As detailed in both the Petition and Report, one item of Petitioner's new evidence was testimony of Rosa Colima Mendez ("Mendez"), the mother of victim Juan M. (*See Pet.* 25; *Report* 14:5–8, 15:8–16:13.) Mendez testified at the February 16, 2012 evidentiary hearing on Petitioner's state habeas petition held in the San Diego Superior Court. (*Lodgment* 17, *vol. 3*, *Ex. 4*.) At the hearing, she stated that she accompanied her son to Petitioner's preliminary hearing, at which time she overheard her son and some of the other boys at the courthouse discussing the possibility of receiving money upon Petitioner being sent to jail. (*Lodgment* 17, *vol. 3*, *Ex. 4*; *see Pet.* 25; *Report* 14:5–8,

15:8–16:13.) Mendez also testified that during one of the prosecutor's visits to her home, she informed the prosecutor about what she overheard. (*Lodgment* 17, *vol.* 3, *Ex.* 4.)

The Report determined—as did the state habeas court that conducted the actual hearing—that Mendez's testimony was not accurate or candid. (*Report* 22:22–24.) One basis for that determination was a discrepancy between Mendez's testimony and that of her son Juan M. Mendez, who speaks Spanish and has little understanding of English, testified that the courthouse conversation she overheard was in Spanish, whereas Juan testified that the conversation was in English. According to the Report, this discrepancy brought "into question whether Ms. Mendez actually heard or understood the conversation, and whether the conversation really ever occurred." (*Report* 23:1–2.) According to Petitioner, the discrepancy is minor at most. (*Pet'r's Obj.* 7:11–15.)

The Court's review of Mendez's testimony leads it to the same conclusion as that of the Magistrate. Even assuming that the language-related inconsistency were insufficient to discount Mendez's testimony, the Report also noted—and this Court's review of the evidence confirms—that her testimony contained a marked number of other inconsistencies. Petitioner does not address or otherwise clarify any of them. The Report also noted that beyond Mendez's testimony that she told the prosecutor about the boys' courthouse she overheard, nothing else in the record indicates she in fact notified the prosecutor. (*Report* 15 n.9.) In light of the above, it cannot be said that the Report's assessment of this testimony was unreasonable or faulty.

### 3.   *Testimony of Juan M.*

Victim Juan M. also testified at the February 16, 2012 evidentiary hearing in the San Diego Superior Court. (*Lodgment* 17, *vol.* 3, *Ex.* 6.) At the hearing, Juan stated that he and some of the other boys discussed the possibility of receiving money in the wake of testifying against Petitioner. (*See id.*) Juan also testified about the same conversation Mendez claimed to have overheard on the day of Petitioner's preliminary hearing. (*Id.* at 11–17.) However, unlike Mendez, Juan testified that the conversation took place in

English, not Spanish. (*Id.* at 11, 13, 16–17.) Furthermore, Juan testified that he exaggerated his trial testimony, he did so because he did not want to be perceived as an "outsider," and that given his knowledge as an adult about what constitutes sexual touching, he believes Petitioner touched his genitals on accident. (*See generally id.*) Petitioner contends that the Report's rejection of Juan's testimony was based on "rank" and "trifling" speculation. (*Pet'r's Obj.* 7:1–22.) Petitioner largely bases this assertion, again, on the Report's recognition of the disparity between what Juan and Mendez testified regarding the courthouse conversation that Mendez overheard. (*Id.*) Yet, notwithstanding its rejection of Juan's testimony, the Report indicates a number of other reasons for which it found Juan's testimony to be unavailing even if assumed to be completely credible. (*Report* 23:8–24:12.)

Specifically, the Report explains that "only a small portion of [Juan's] new testimony contradicts what he said at trial." (*Id.* at 23:13–14.) The Court's review of Juan's testimony confirms that finding. In addition, as the state habeas court and the Report recognize, Juan's after-the-fact assessment of what was in the Petitioner's mind at the relevant times is speculative. (*See Lodgement* 17, *vol.* 4, *Ex.* 6, 26.) The determination of Petitioner's intent was a jury function, and the jury ultimately determined Petitioner acted with the requisite intent for his convictions. (*See Report* 23:16–24:12.)

Therefore, in light of the above, and for the reasons discussed in the Report, the Court agrees with the Report that Petitioner has failed to make the requisite showing of actual innocence. Simply put, Petitioner's "new" evidence is not so compelling that, if presented during trial, no reasonable juror would have voted to find him guilty beyond a reasonable doubt. See, e.g., Schlup, 513 U.S. at 329. As a result, Petitioner cannot avail himself of McQuiggin's actual innocence gateway to have his petition heard on the merits notwithstanding the expiration of the AEDPA's one-year limitations period.

//

//

//

14cv1080w

1    IV.    CONCLUSION

2            For the foregoing reasons, the Court agrees with the Report's findings and

3    conclusion that Petitioner's Petition is untimely and that Petitioner has failed to

4    demonstrate his "actual innocence" under McQuiggin and Schlup.  Thus, the Court

5    **ADOPTS** the Report (Doc. 13) with additional explanation regarding the equitable

6    tolling issue.  Accordingly, the Court **GRANTS** Respondent's motion and **DISMISSES**

7    the Petition (Doc. 8) **WITH PREJUDICE**.  Also, because reasonable jurists would not

8    find the Court's assessment of the claims debatable or wrong, the Court **DENIES** a

9    certificate of appealability.  See Slack v. McDaniel, 529 U.S. 473, 484 (2000).  The Clerk

10   of the Court shall close the district court file.

11           **IT IS SO ORDERED.**

12

13   DATED:  April 13, 2015

14                                                     _____

15                                                     Hon. Thomas J. Whelan
                                                       United States District Judge
16

17

18

19

20

21

22

23

24

25

26

27

28